# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Use of </br></br>A Cell-Site Simulator to Identify the Cellular Device Used by Unknown Person(s) | )<br>)   Case No.  20-sw-00632-GPG<br>)<br>)<br>)<br>)<br>) |

**APPLICATION FOR A SEARCH WARRANT**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit.

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC § 841 and 846 | Conspiracy to Distribute and Possess with the Intent to Distribute a Controlled Substance |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☒ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Kevin Doheny*
*Applicant's signature*

Kevin Doheny, Special Agent, DEA
*Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
                          ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 4/6/20

*Judge's signature*

City and state:  Grand Junction, CO.         Gordon P. Gallagher, Magistrate Judge
                                             *Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Kevin Doheny, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique further described in Attachment B, in order to identify the cellular device or devices carried by the drug source of supply, who is described as an unknown Hispanic Male (the "Target Cellular Device"), described in Attachment A.

2.  I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice, and as such I am empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I have been employed as a DEA SA for over two years, with seven years of prior law enforcement experience with the Panama City Police Department, Panama City, FL. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act, and I have testified in judicial proceedings for violations of laws concerning controlled substances. During my time with the DEA, I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code. I have been involved in various types of electronic surveillance, in the execution of search

and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. This Court has authority to issue the requested warrant under Federal Rule of Criminal Procedure Rule 41(b)(1) & (2) because the Target Cellular Device is currently believed to be located inside this district, or will be located in this district, because the source of supply is going to deliver 1,000 counterfeit trademark opiate pills containing fentanyl from Mexico to Avon, CO.

5. In March 2020, a Hispanic male by the alias "Sean Penn" contacted a DEA confidential source (CS-2) via voice call, utilizing account 702-374-2864 and using an alias of "Frank Lucas" through Confide App, which is an encrypted mobile application. CS-2 maintained regular contact with "Penn." In April 2020, "Penn" told CS-2 that he could arrange the delivery of drugs in CO to CS-2. CS-2 and "Penn" reached an agreement for a partial payment of $7,500 in exchange for 4,000 counterfeit trademark oxycodone opiate pills that contain fentanyl. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 and 846, Conspiracy to Distribute and Possess with the Intent to Distribute a Controlled Substance, have been committed, are being committed, and will be committed by the

source of supply.  There is also probable cause to believe that the identity of the Target Cellular Device will constitute evidence of those criminal violations.  In addition, in order to obtain additional evidence relating to the Target Cellular Device, its user, and the criminal violations under investigation, law enforcement must first identify the Target Cellular Device.  There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

6. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.  *See* 18 U.S.C. §§ 3121-3127.  This warrant therefore includes all the information required to be included in a pen register order.  See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

7. On December 28, 2017, an individual, identified herein as J. E., died from a fentanyl related overdose in Carbondale, Colorado.  On the same date, another individual, identified herein as Z.G., survived a fentanyl related overdose.  Between January 2018 and February 2019, the DEA Grand Junction Resident Office (GJRO), DEA Glenwood Springs Post of Duty (GSPOD), and the Western Colorado Drug Task Force (WCDTF) have been jointly investigating a Drug Trafficking Organization (DTO) responsible for the importation of counterfeit trademark opiate oxycodone pills that contain fentanyl from Mexico into Colorado.

8. To date, agents have been able to identify as many as ten overdose deaths involving fentanyl from the beginning of 2017 through the summer of 2018 in Mesa and Garfield

3

counties, which are believed to be related to this DTO.  This investigation ultimately identified Bruce Holder as the primary distributor of the counterfeit oxycodone pills laced with fentanyl for the DTO, and a person identified as "Chon" was his source of supply.

9. On August 16, 2018, Holder was indicted for one count of distribution of fentanyl resulting in death and one count of distribution resulting in serious bodily injury.

10. On September 4, 2018, U.S. Magistrate Judge Gordon P. Gallagher signed a search warrant for an iPhone that was seized from Bruce Holder at the time of his arrest.  The iPhone was forensically examined, and I was provided with the downloaded information.

11. I reviewed the downloaded information from Holder's telephone.  A search and examination of this phone revealed the WhatsApp contact "Chon" was associated with Mexican telephone numbers 52-667-235-9939, 52-667-405-9445, and 52-653-161-1824.  I also identified "Chon" as being associated with U.S. phone numbers 323-818-6477, 310-980-7863, 442-225-2046, and 626-474-1761.  It appeared that "Chon" used multiple phones and changed his phone number frequently.  The WhatsApp conversation between Holder and "Chon" contained frequent references to drugs, more specifically heroin and pills.

12. Over the course of the investigation, agents from the DEA conducted debriefs of CS-2, who is still working with law enforcement, regarding the Bruce Holder Drug Trafficking Organization, and his associates.  CS-2 contacted law enforcement after Holder's arrest to explain the CS's knowledge of Holder and Holder's associates.  CS-2 has known Holder for approximately 20 years and had purchased pills from Holder.  CS-2 paid $20 per pill and would purchase anywhere from 5-30 pills at a time.  CS-2 is providing information because he/she

knows the pills that are being distributed contain fentanyl and he/she fears other users will die. CS-2 is aware of Ashley Romero, who died from an overdose that included fentanyl. I have reviewed an autopsy report for Romero that confirms she died on June 11, 2018, from a multi-drug overdose that included fentanyl. CS-2 has a criminal history, with the most recent item from January 2008, which was a probation violation. The CS has not received any new charges since and has steady employment. To my knowledge, CS-2 has never knowingly provided information related to the drug trafficking activities of "Penn," Holder, and/or their associates that has proven to be false. I have been able to corroborate some of the information obtained from CS-2, adding to CS-2's credibility.

13. On October 30, 2018, CS-2 conducted a controlled purchase of methamphetamine from Marie Matos, who is Bruce Holder's common law wife. Prior to the controlled purchase, Matos told CS-2 that she had nine pounds of methamphetamine stashed in Grand Junction, CO. Matos asked CS-2 to help her sell the methamphetamine and Matos also provided CS-2's phone number to her source of supply, whom she referred to as "Sean Penn." Based on this investigation, I believe that the aliases "Chon" and "Sean Penn" refer to the same person, Nunez Pena. For the purposes of the rest of this affidavit, this person will be referred to as Nunez Pena.

14. In November 2018, Nunez Pena contacted CS-2 via WhatsApp, utilizing account +52-1-667-755-4694. Nunez Pena told CS-2 that he could arrange the delivery of drugs to Grand Junction, CO. CS-2 and Nunez Pena reached an agreement for $12,000 in exchange for 1,000 counterfeit trademark oxycodone opiate fentanyl pills. Nunez Pena explained to CS-2 that

5

a courier would leave Mexico and deliver the pills to Grand Junction, CO.  CS-2 and Nunez Pena conversed through WhatsApp by texting and voice calls.

15. Based on phone conversations between the CS-2 and Nunez Pena, a drug courier was sent to deliver drugs to Grand Junction, CO.  On November 29, 2018, CS-2 purchased 985 counterfeit trademark opiate fentanyl pills from a courier, later identified as Paul Zurita Esparza, sent by Nunez Pena.  CS-2 met with Zurita Esparza at the mall, and then they walked to a blue Toyota sedan, with Mexico license plate WEK6396.  DEA Intel Analyst Amber Jones was able to identify Zurita Esparza through border crossing information, which revealed that on November 28, 2018, at approximately 6:14 pm (EST), that vehicle crossed from Mexico into the United States through the Lukeville, AZ, Point of Entry and Zurita Esparza was the driver and sole occupant of the vehicle.  IA Jones obtained a photograph of Zurita Esparza, which was shown to agents and investigators who observed Zurita Esparza with CS-2.  ATF SA Brandon Garcia, WCDTF Inv. Tanya Brechlin, and WCDTF Inv. Nicole Briggs all agreed that it was Zurita Esparza.  CS-2 gave Zurita Esparza the $12,000 and, after counting the money, Zurita Esparza gave CS-2 a plastic bag that contained counterfeit trademark oxycodone opiate fentanyl pills.  The round light blue pills were imprinted with an "M in a box" identifying mark on one side and "30" on the other side.  The pills were submitted to the DEA Western Laboratory for forensic analysis.  The lab results revealed the pills contained a mixture of fentanyl and acetaminophen.

16. On January 10, 2019, CS-2 received information from Nunez Pena that the courier–later confirmed to be Zurita Esparza–delivered approximately 2,500 fentanyl pills and

6

capsules to Marie Matos. On January 9, 2019, Stinker Gas Station in-store surveillance video showed that Zurita Esparza delivered the pills to Matos while she was at work in Grand Junction, CO. On January 10, 2019, Matos was arrested for a state warrant of aggravated incest. Following her arrest, a Grand Junction Police Department narcotics canine alerted to the odor of controlled substances coming from within Matos's vehicle, of which, Matos was the driver and sole occupant. A probable cause search of the vehicle revealed approximately 2,500 fentanyl pills and white/blue capsules. The pills were submitted to the DEA Western Laboratory for forensic analysis, which revealed 1,968 round light blue pills were imprinted with "M" in a box on one side and "30" on the other side. The lab results revealed these pills contained a mixture of fentanyl and acetaminophen. Lab results also showed that 413 white and blue capsules did not have any markings on them, and they contained a combination of methamphetamine, tramadol, and lidocaine.

17. On January 14, 2019, I, along with Special Agent Zac Jones, cleaned out Matos's vehicle in preparation of forfeiture proceedings. In Matos's wallet there was a piece of paper with hand-written notations of "Bertoldo Nunez" and "7728751970." Based on the investigation, including records obtained in a search of Bruce Holder's and Matos's home, I know that 7728751970 is a Wells Fargo Bank Account number for Nunez Pena.

18. Following Matos's arrest, CS-2 continued to talk with Nunez Pena. Based on phone conversations between CS-2 and Nunez Pena, another controlled purchase was set up in Lakewood, CO. On February 13, 2019, CS-2 spoke with Nunez Pena at +52-1-653-208-0104 to arrange the controlled buy. CS-2 purchased counterfeit trademark opiate fentanyl pills from a

Hispanic male, who was later identified as Victor Ortega Ochoa. Ortega Ochoa is a Denver source of supply that is sourced by Nunez Pena. Agents believe Zurita Esparza is the courier that supplies Ortega Ochoa.

19. During this controlled purchase, CS-2 gave Ortega Ochoa $12,000 and Ortega Ochoa gave CS-2 a Wendy's restaurant bag that contained counterfeit trademark opiate fentanyl pills. The pills were submitted to the DEA Western Laboratory for forensic analysis. The 1,994 round light blueish green pills were imprinted with "M" in a box on one side and "30" on the other side. The lab results revealed the pills contained a mixture of fentanyl and acetaminophen.

20. In May 2019, CS-2 arraigned a partial payment for Nunez Pena, which would be paid to Ortega Ochoa. On May 16, 2019, CS-2 paid $4,000 to Ortega Ochoa at a McDonald's in Grand Junction, CO. Ortega Ochoa was driving a white Porsche Cayenne with Colorado license plate–QCW341, which was the same vehicle he was driving when he sold the pills to CS-2 on February 13, 2019. After the payment, mobile surveillance followed the Porsche until it reached the area of Rifle, Colorado, where a Colorado State Patrol Trooper stopped it for a traffic violation. The male driver was identified as Victor Ortega Ochoa. The female passenger believed to be Ortega Ochoa's girlfriend was identified as Lidia Chavez Ortiz, who was also present during the February 13, 2019 controlled buy.

21. In July 2019, DEA Los Angeles (LA) set up a controlled buy of counterfeit trademark opiate fentanyl pills that would be sourced by Nunez Pena, but delivered by an unknown courier. On July 11, 2019, Zurita Esparza drove a vehicle, with Mexico license plate VEP787A, across from Mexico into the United States through the Lukeville, AZ, point of entry.

DEA LA obtained License Plate Reader (LPR) information which confirmed that Zurita Esparza drove toward California. The controlled buy did not occur, but DEA LA executed a search warrant 17251 Glenhope Dr., La Puente, CA, which is an address associated with Nunez Pena. As a result of the search warrant, agents seized approximately 4,000 suspected counterfeit trademark opiate fentanyl pills.

22. CS-2 continued to talk with Nunez Pena. Based on phone conversations between CS-2 and Nunez Pena, another controlled buy was set up in Durango, CO. CS-2 and Nunez Pena discussed who would be delivering the pills, and according to CS-2, Nunez Pena explained it would be the same person CS-2 met with during the November 29, 2018 controlled buy, which is Zurita Esparza.

23. In September 2019, Nunez Pena contacted CS-2 via voice call, utilizing phone number +52-1-667-453-3480 and through the Confide App, which is an encrypted mobile messaging application. CS-2 and Nunez Pena reached an agreement for $10,000 in exchange for 1,000 counterfeit trademark oxycodone opiate fentanyl pills. CS-2 agreed to pay an additional $2,600 for counterfeit trademark oxycodone opiate fentanyl pills that were previously received. CS-2 and Nunez Pena agreed for the drug deal to take place in Durango, CO, on September 19, 2019.

24. On September 15, 2019, CS-2 received a Confide App message from Nunez Pena, who explained that Zurita Esparza was arrested that morning. I have not been able to corroborate that information as it is unknown where Zurita Esparza was arrested, or if he was in

fact arrested.  A search of NCIC returned with negative results.  However, Nunez Pena explained to CS-2 that the drug deal could still be completed in Durango, CO.

25. On September 19, 2019, CS-2 spoke with Nunez Pena at +52-1-667-453-3480 to arrange the controlled buy in Durango, CO. The price for these pills was $10 each.  The agreement was for the CS to pay $10,000 for 1,000 pills, $2,600 towards a past due amount from a previous controlled buy, and 1,000 pills were provided "on the front" ("front" is a street term for receiving drugs and then paying for them at a later date, presumably after the drugs are sold).  The past due amount from the previous buy, was from a controlled buy conducted on July 2, 2019, in Lakewood, Colorado.

26. On September 19, 2019, CS-2 purchased counterfeit trademark opiate fentanyl pills from a Hispanic male, who was later identified as Mario Solano.  Solano is a Phoenix, AZ area source of supply that is sourced by Nunez Pena.  During this controlled purchase, CS-2 gave $12,600 and Solano gave CS-2 a Burger King restaurant bag with a Kind granola bars box that contained counterfeit trademark opiate fentanyl pills.  The pills were submitted to the DEA Western Laboratory for forensic analysis.  The round light blueish green pills were imprinted with "M" in a box on one side and "30" on the other side and had a total net weight of 215.6 grams.  Based on the weight per pill, this would equate to approximately 2,000 pills. The lab results revealed the pills contained a mixture of fentanyl and acetaminophen.

27. On November 19, 2019, CS-2 spoke with Nunez Pena on the phone regarding an upcoming controlled buy. Nunez Pena used phone number 702-374-2864. Nunez Pena explained he would send the same courier from the prior controlled buy, who was identified as Mario

Solano. Nunez Pena agreed to provide 5,000 fentanyl pills in exchange for a partial payment of $5,000. Nunez Pena and CS-2 agreed to do the drug deal on November 26, 2019 near Phoenix, AZ.

28.     On November 26, 2019, CS-2 and Nunez Pena communicated through the Confide Application. Nunez Pena sent CS-2 a message that read "+1 (480) 468-3512 rio." Rio is believed to be an alias for Mario Solano, from the last three letters of his first name. CS-2 contacted Solano at that phone number and they agreed to meet at Walmart in Chandler, AZ.

29.     Once Solano arrived, he approached CS-2. Solano gave CS-2 a black "Fit Simplify" bag that contained a zip lock bag that contained small light blue round pills that were imprinted with "M" in a box on one side and "30" on the other side. CS-2 gave Solano $5,000 as a partial payment. SA Doheny noticed that it did not appear to be 5,000 pills in the bag like agreed on. CS-2 spoke with NUNEZ PENA, who used phone number 702-374-2864. Nunez Pena explained that everything was good and he intended to give CS-2 5,000 pills but Solano had to make a delivery of 3,000 pills prior to meeting with CS-2. Nunez Pena was arranging another large shipment of pills from Mexico into the US. Nunez Pena told CS-2 that he would arrange for CS-2 to get 3,000 pills the next time CS-2 made another partial payment. The pills were submitted to the DEA Western Laboratory for forensic analysis.  The round light blueish green pills were imprinted with "M" in a box on one side and "30" on the other side and had a total net weight of 215.8 grams.  Based on the weight per pill, this would equate to approximately 2,000 pills. The lab results revealed the pills contained a mixture of fentanyl and acetaminophen.

30.     CS-2 and Nunez Pena continued to communicate through voice calls, WhatsApp and the Confide App.  In March 2020, CS-2 agreed to make another partial payment to Nunez Pena; however, due to travel restrictions from COVID-19 the next controlled buy was moved to April 2020.  On April 1, 2020, Nunez Pena called CS-2 from 702-374-2864 to confirm that Nunez Pena would arrange the delivery of 4,000 counterfeit trademark oxycodone pills that contain fentanyl in exchange for a partial payment of $7,500. Nunez Pena told the CS the pills were green in color.  Nunez Pena is not going to deliver the pills personally; rather, he is going to send another drug courier, who Nunez Pena identified as his "cousin" and he lives in Denver, CO.  The controlled buy has been scheduled for April 8, 2020 in Avon, CO; however, the exact location is subject to change.  It is planned that CS-2 will be in contact with Nunez Pena up to, during, and after the drug deal is complete.  The warrant sought herein will allow agents to potentially identify the drug courier and/or another possible source of supply.

## MANNER OF EXECUTION

31.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.  These signals include a cellular device's unique identifiers.

32.     To facilitate execution of this warrant, law enforcement may use an investigative device that sends signals to nearby cellular devices, including the Target Cellular Device, and in reply, the nearby cellular devices will broadcast signals that include their unique identifiers.  The

investigative device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cellular phone to communicate with others. Law enforcement will use this investigative device when they have reason to believe that "Penn," the drug courier, and/or the Denver source of supply is present. Law enforcement will collect the identifiers emitted by cellular devices in the immediate vicinity of the Target Cellular Device when the subject is in multiple locations and/or multiple times at a common location and use this information to identify the Target Cellular Device, as only the Target Cellular Device's unique identifiers will be present in all or nearly all locations. Once investigators ascertain the identity of the Target Cellular Device, they will cease using the investigative technique. Because there is probable cause to determine the identity of the Target Cellular Device, there is probable cause to use the investigative technique described by the warrant to determine the identity of the Target Cellular Device.

33.     The investigative device may interrupt cellular service of cellular devices within its immediate vicinity. Any service disruption will be brief and temporary, and all operations will attempt to limit the interference to cellular devices. Once law enforcement has identified the Target Cellular Device, it will delete all information concerning non-targeted cellular devices. Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the Target Cellular Device from all other devices.

## AUTHORIZATION REQUEST

34.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

35.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the person carrying the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

36.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to identify the Target Cellular Device outside of daytime hours.

37.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

38. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

> Respectfully submitted,
> *s/ Kevin Doheny*
> Kevin Doheny
> Special Agent
> Drug Enforcement Administration

**I, Jeremy Chaffin, Assistant United States Attorney have reviewed and submitted this affidavit and application. Based on the facts as represented in this affidavit, I certify under the penalty of perjury that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Drug Enforcement Administration.** *See* **18 U.S.C. §§ 3122(b), 3123(b).**

> JASON R. DUNN
> UNITED STATES ATTORNEY
>
> *s/ Jeremy Chaffin*
> JEREMY CHAFFIN
> Assistant United States Attorney
> 205 N. 4th St., Ste. 400
> Grand Junction, CO 81501
> Phone: 970-257-7113
> Email: Jeremy.chaffin@usdoj.gov
> Attorney for Government

Submitted, attested to, and acknowledged by reliable electronic means on April 6, 2020.

_____
Gordon P. Gallagher
UNITED STATES MAGISTRATE JUDGE

15